Good morning, Mr. LaPorte. Good morning, Your Honor. Oh, good, you have a wonderful deep voice. And I will do my best to stand close to the microphone. Thank you. May it please the Court. My name is David LaPorte and I represent the petitioner, D N D International. We've come before the Court this morning seeking affirmation of two fundamental principles of due process. The first is that if a statute or circumstances empower the government to deprive a party of a protective right without notice or an opportunity to be heard, that summary deprivation cannot remain in effect for an indeterminate period of time before the party receives a post-deprivation hearing and disposition. I would like to tell you I have a problem here. The ALJ rescinded the imminent hazard order based on two alternative grounds. The first one was that the review was not completed within 10 days and the second was that there was a failure to prove an imminent hazard. The FMCSA, Assistant Administrator, affirmed on the second of those alternative grounds. And therefore, D N D has obtained all the relief it sought. I really cannot understand how it can be considered an aggrieved party adversely affected by the final order. Well, Your Honor, as we set forth in our briefs, D N D has suffered a separate distinct injury in fact that was not addressed by simply rescinding the imminent hazard order. The imminent hazard order was allowed to remain into effect for longer than what was statutorily allowed. So even by rescinding the order and giving D N D the relief it asked for, D N D is still aggrieved by the fact that the order was allowed to remain into effect for longer than statutorily allowed. Well, what relief is left for this appeal? Isn't this appeal really a request for a declaratory judgment or an advisory opinion? And of course, there's no authority for such an appeal. Your Honor, as we indicated, D N D remains subject to the jurisdiction of the Federal Motor Carrier Safety Administration. D N D is subject to the imminent hazard statute as it operates today. So we're not talking about some abstract relief which D N D has no interest in obtaining or by which D N D would not benefit by that relief. I don't understand. What do you want us to order? We want the court to reverse the assistant administrator's decision that ruled that the, what relief do you want us to order? I understand you disagree with part of his reasoning, but his final decision was in your favor. And we can't, compensation for a wrongful order is not allowed as near as I can tell. Right. One of the issues that we have with the assistant administrator's decision is that at the time of the hearing, the established administrative case law held that D N D was entitled to a hearing and decision within 10 days of its request for a hearing. Right. Okay. When the assistant administrator issued its ruling, the assistant administrator didn't simply vacate that opinion or overturned that opinion and revert back to the holding that we were entitled to a ruling within 10 days of the request. What the assistant administrator did was took it a step further and said, no, you are, uh, uh, you, the only thing that you are entitled to or the future D N D is entitled to is a, uh, is, is to begin the hearing within 10 days of the request. Right. And I understand you disagree with that. And I understand you've got good reasons, both statutory and constitutional for disagreeing with that. But to go back to judge Rovner's question, what can we do other than give an advisory opinion to the administrator? You could, you could declare that that decision to be unconstitutional or that ruling to be unconstitutional. And why would that not be advisory? Because it would affect D N D in the future moving forward. I thought you were out of business. And there's no threat, no indication of any potential for repetition here. We, we, uh, we are out of business as a motor carrier hauling freight for hire. We still operate commercial motor vehicles that we leased to other motor carriers. The eminent hazard statute applies to vehicles as well as motor carriers. And also we would have an economic interest in, in, as we lease our equipment to other motor carriers who are subject to the motor carrier provisions of the eminent hazard statute. So you really do want something, the change in the way this one hand was handled. You want something, you want a, a much, uh, earlier contact to what obviously was a horrific accident, but what went on after that, uh, was, uh, what it was about two months investigation before. Yeah, sure. I guess all we would be saying is that, that during that two month period, they should be directly engaged with the carrier. The carrier did some remedial things right off, as I understand it. At the close of the investigation. Yes, your honor. At the, at the time that the investigation results were shared with us, we took very prompt remedial action, right? So that this, which may have resolved everything instead of shutting it down. And of course the shutdown is what is, you know, sort of alarming to me just because everybody is frozen in place. You've got shipments and, and, and, you know, they, we had described it all. It's obviously that when something, I don't know how many trucks you had out there on the road. I believe at a time it was about 30, 30 to 35 trucks. Okay. So if there are 30 or 35 trucks that are loading, unloading, traveling, whatever, they're frozen in their place. And that probably put you out of business or at least put whatever else happened. I guess all that would be doing is trying to say in the future, there should be some sort of a pre deprivation hearing. And, and that would be nice for the whole industry. Other than that, I don't really know what we can do. Right. Your honor, they, they, they, at the close of the investigation, the FMCSA sits down with the motor carrier and they discuss the results and they discuss what the proposed adverse actions may be. They tell the motor carrier that you could be getting a conditional safety rating, or you could be receiving an unsatisfactory safety rating, or that you could be receiving some civil penalties in the future. For some reason, the FMCSA doesn't advise the motor carrier, you're also being considered for an imminent hazard order, or you meet our criteria for consideration of an imminent hazard order. Was this by implication, by not saying that there, there isn't one? Well, well, certainly with respect to the D&D where, where the only adverse implication or adverse action contemplated was, was a conditional safety, safety rating, which led us to believe that we would be continuing to operate without taking immediate, remedial action or without immediately abating the, the violation. I see no legitimate purpose that's served by keeping this information secret from the motor carrier. If the motor carrier is advised at the same time that the FMCSA is discussing the results of their investigation, that, you know, you're going to get a conditional rating, or you're going to get a fine, what purpose is served by not also informing the motor carrier you're under consideration for an imminent hazard order? It seems to me that if you provided that information to the motor carrier, the motor carrier would immediately abate whatever. How often does this happen? I'm sorry, how often does the agency issue an imminent hazard order? Yes. I, I, I, D&D was, I've been representing companies for about 20 years. This was the first imminent hazard order that I handled. I have since recently handled another one that was issued out of the Eastern Service Center for a company, to a company based out of that. We, we reached a very quick resolution and we did that by, you know, agreeing to a consent order whereby we, you know, we immediately addressed the FMCSA's concerns. Was everything frozen in place in that one? Yes, we were ordered, we were ordered to immediately cease operating just as D&D was. What, what, what, what I find terribly wrong to the point of a constitutional violation on behalf of the FMCSA is they could come to us before they issued the imminent hazard order. The consent order that was put in place to resolve the, the matter with the Massachusetts carrier, that could have been negotiated after the compliance review, but before the imminent hazard order was issued. There's something, uh, corporately wrong about saying the motor carrier is an imminent hazard, but the, it, it, when it takes two weeks to figure that out, right? I'm sorry? There's something wrong about it when it takes two weeks to figure that out. Exactly, exactly. And, and to, and to not provide the motor carrier the opportunity to be heard during that two week period is just wrong. It's just wrong. Well, that's about all we can say. It's wrong, it's wrong, and it's unconstitutional. And if, uh, uh, the, the court would rule in, in D&D's favor, uh, it would, it, it would prohibit these constitutional violations moving forward, uh, in which D&D has an interest in that they are still involved in the motor carrier industry, and they still operate, uh, vehicles regulated by the FMCSA. Who would, who puts out these regulations and others? What, is it a regulatory body, or is there a congressional basis for this procedure? The, uh, imminent hazard statute is, is, uh, is, is a federal statute. The FMCSA has promulgated, uh, regulations supposedly implementing, uh, the imminent hazard statute, but the regulations really do nothing more than repeat the statute, the verbatim. The regulations don't deal with the timing of something, or the draconian effects of it, or what happens, because the saying that it's, you know, obviously if there's some, uh, determination that drivers are, a lot of drivers do not even have a chauffeur's license, or shouldn't be driving, or they're actually high, hauling drugs, or doing something that is very alarming, but the small things they found here, uh, and with the end result of shutting down the company, seem to be not in balance. I guess that's what you're saying, and you want, in the future, maybe there'd be some sort of a change in policy, or regulation, or what? Well, Your Honor, I, I certainly acknowledge that there are times and circumstances when the FMCSA does have to act immediately, and the imminent hazard statute does give them that authority to act immediately without pre-deprivation notice, or an opportunity. For some, for some real issue that is pervasive. Absolutely, there's a driver out there, there's evidence that a driver out there is operating under the influence of drugs, so let's issue an imminent hazard order, immediately declare that, that driver, that vehicle, uh, out of service to be an imminent hazard. Well, that's just one driver, which happened here, of course, but as far as the whole company, that's all I'm saying. Right, as far as the whole company, and that's where I think the FMCSA runs into constitutional problems, because the attempt to administer the imminent hazard statute as if it was just another safety rating, uh, there's a satisfactory safety rating, a conditional safety rating, and an unsatisfactory safety rating, and it seems, it seems to me that the FMCSA attempts to use their imminent hazard authority as just another safety rating, where at the end of the compliance review, we issue a safety rating, and we also make a determination as to whether or not the carrier is, is an imminent hazard. Well, if you're, if, if you're going to, uh, uh, uh, do that, and you're, and you're going to declare the, the motor carrier an imminent hazard, but you have a process whereby the compliance review needs to be submitted to the division office. The division office then forwards it up to the, to the field administrator. The field administrator looks over everything and then consults with, with, uh, various carrier officials, and then the hazard order is, is issued, and then all of a sudden, boom, the carrier has to stop operation, stop in place. That is a, that is a clear violation of the due process clause, because there's no reason to proceed that way. There's no reason, there's no legitimate government interest in keeping that information secret from the motor carrier. Counsel, if I could, uh, ask indulgence of the presiding judge for just a moment. I was wondering if you could just compare these procedures, uh, to the kind that are used in district courts when a party is seeking an ex parte temporary restraining order. Yes, Your Honor. I, I, I did mention that briefly. Uh, I, I, I believe the imminent hazard order is very analogous to an ex parte, uh, temporary restraining order. I actually described it, uh, before the agency as a, as a, uh, TRO on steroids, because not... It's a pretty good description. You don't have to go to a neutral party, and, uh, at least according to the agency, it can stay in place indefinitely. Uh, uh, absolutely. And we know that a TRO expires unless it is converted to a, uh, uh, preliminary, a preliminary, a preliminary permanent injunction within a defined period of time. I think the rule is 14 days. And so, uh, I think the intent... And, and to proceed ex parte, you've got to have a good reason to do so without giving the enjoined party an opportunity first to be absolutely, absolutely. And, uh, so I, I believe that was Congress's intent in requiring that a hearing occur within 10 days. And the, the hearing and, and disposition within 10 days. Uh, the federal rules of civil procedure, I believe grant, grant 14 days. And if, and, and if the agency doesn't, doesn't get that imminent hazard order approved within that 10 day period, I believe it expires just as a TRO would expire. Thank you. Thank you very much. You also used up the time, but it was our fault. So we'll give you two more minutes. Thank you, Your Honor. Thank you. Hello, Mr. Haveman. Good morning. May it please the court, Will Haveman on behalf of the FMCSA. DND petitions this court for review of a final agency order in which a DND prevailed. Now, because there is no relief that this court could issue that would redress the harms about which DND complains, DND lacks standing in this court to dismiss the petition. Now, uh, Congress gave this court jurisdiction only over petitions by aggrieved persons who are adversely affected by a final agency order. But the final agency order here rescinded the out of service order about which a DND complains and that is the source of DND's alleged injury. Uh, DND therefore was the DND itself, which has petitioned the agency for attorney's fees under the Equal Access to Justice Act on the grounds that it was the prevailing party before the court. And it is difficult to see how a DND could be a prevailing party for purposes of EJIA while also being an aggrieved person for purposes of this court's jurisdiction. Nevertheless, it's pretty easy to see why they feel aggrieved, isn't it? It is understandable why they feel aggrieved, but what's important is that Congress gave them, uh, Congress gave this court jurisdiction only over the final order. Could we talk, could we talk about the due process dimensions of this, this rather extraordinary procedure, Mr. Haveman? Sure. I'd be happy to discuss the due process dimensions, but I do want to note that those dimensions are only relevant if the court finds that there is standing here. I understand that perfectly. But, um, uh, there are situations where, um, parties may face, um, threat of recurring harm. Uh, we're talking here about procedures that work so fast where there is no effective, um, post-deprivation remedy. You can remove the order, but there's no damages relief against the government, is there? No, there's not. Okay. So, um, the, the dangers of a wrongful deprivation are serious and appear to have been realized in this case. Um, how imminent is imminent here when, when, uh, and, and why doesn't due process require at the minimum an opportunity to be heard before this deprivation is imposed? Well, the Supreme Court has recognized, and this court has recognized, that where the need to act, where there's an emergency need to act. Granted, granted, an emergency need to act, but here we've got months, weeks, uh, what, at least two weeks of internal consultations, right? Respectfully, I disagree. There was a compliance review as a result of the catastrophic crash of January 27th, 2014. That compliance review, uh, was completed at the end of March, uh, March 21st. Right. Now, between March 21st and April 1st, there was an internal discussion within the agency as to to constitute an imminent hazard. Right. At the very moment, at the very moment that the agency determined that D&D's continued operation did present an imminent hazard, it issued the order. There simply wasn't. When you're consider, when you're considering that kind of thing, um, I go back, look, to a lot of time on a district court. Yes. And the imminent hazard order here looks a lot to me like an ex parte TRO, except that the plaintiff gets to issue it itself, right? Um, the agency does. In some respects, yes. And in this case, on an ex parte basis. Uh, now, you can do that kind of thing if there's a sufficient emergency, but you got to have a good reason for not taking the time to at least place a phone call to the party threatened with, uh, the destruction of its business on an ex parte basis. Well, Your Honor, I can only point this court to what the Supreme Court has said and what this court has said about, uh, the appropriate balance between the need to act on an emergency basis and the risk of error. Which I totally get. What I don't get is how imminent can take 10 days. Well, anytime. Or 12 days here. Your Honor, anytime an agency is tasked with making a decision that is as consequential as the decision that is made here, of course, it would require the agency. And that's a perfect argument for placing at least a phone call to the affected party, right? Giving them an opportunity to respond in case you're operating on the basis of mistaken information. Your Honor, I don't know of any case that suggests that the government is required to tell, uh, a regulated party about its internal deliberative process, about the potential. I don't know either, but here we're talking about an extraordinary power. Your Honor. Available only in a genuine emergency, and this looks like a perfect recipe for abuse of that power. Particularly in the wake of a review where you only found, what, a conditional safety rating, right? Your Honor, to clarify the distinction between the compliance review that is discussed in DND's brief and the imminent hazard order. The compliance review reviews the overall compliance of the regulated motor carrier with all of the regulations that apply to the of a single, uh, of a single prohibition to result in an unsatisfactory, uh, an unsatisfactory rating. It is simply not possible. It requires at least two different categories to be unsatisfactory before it results in overall unsatisfactory safety rating. So the compliance review scheme and the imminent hazard scheme, uh, operate in tandem and complement one another. And what the compliance review scheme is aimed at looking at is the overall compliance with the regulatory scheme and what the imminent hazard order is looking at is whether or not allowing either the driver or the truck or the companies to continue operating will substantially increase the likelihood of serious injury or death. And that is what the field administrator determined in this case. The field administrator determined that by allowing DND to continue operating, even though it had a limited ability to monitor its trucks and to make sure that its drivers were not fatigued, that that substantially increased the likelihood of serious injury or death. And that took from 11 days after the end of the compliance review, right? It took 10 days between the end of the compliance review, looking more closely at the results of the compliance review. April 1st? March 21st to April 1st? 11 days, I'm sorry. Okay. 11 days is correct. And, um, if, let's go beyond the time that the order is issued, um, this, this idea, I think your brief referred to the, um, strict 10-day limit, which frankly I found rather entertaining if the consequences hadn't been so serious here. Because it's not a strict 10-day limit under the approach the agency is taking. Um, why doesn't the agency take the approach of saying, if we issue an imminent hazard order at the same time we issue the order, we will schedule a hearing before an administrative law judge, just as a district judge does when issuing a temporary restraining order. So, I mean, those orders should say, particularly when they're issued ex parte, this is in effect, you know, for a maximum of x days. Now it's, it used to be 10, now 14. Um, we will have a hearing on thus and such a date where the enjoined party can be heard, or we'll do it sooner upon request. Okay. Why don't you do it that way? Well, your honor, we, the agency does not do it that way because Congress has not asked it to do it that way. What Congress has said is that a regulated party will have the opportunity to do a review. What Congress has said is that there shall be an opportunity for review, and that such review shall occur within 10 days. Was it just opportunity for review? What's the statutory phrase? The statutory phrase is that, uh, subsequent to issuance of the order, opportunity for review shall be provided in accordance with section 554 of the Administrative Procedure Act. Opportunity for review. And therefore, the agency, in trying to, uh, carry out Congress's intent, has interpreted that provision to say that, sure, there will be an opportunity for review. Such review shall occur. But that, and under the agency's, and under the agency's approach, that order can stay in effect how long? Until it is rescinded by the Administrative Law Judge. Unless and until, which is how long? Well, under the agency's approach, as, as expressed by Congress, such review shall occur within 10 days, but that doesn't require the agency to complete it within 10 days. So there is no time limit, is there? I suppose there's no express time limit. That's what I'm asking. There's no express time limit, Your Honor, but I think that the facts of this case show what happens in practice, and that is that everyone recognizes that this is a serious endeavor. And if you recognize it's such a serious endeavor, why not set a sooner opportunity to be heard so the process can be completed within the 10 days? The review can then occur within 10 days. Well, Your Honor, respectfully, I do think that the facts of this case show why completing review within 10 days is, in certain circumstances, extremely difficult and might not provide the parties with an opportunity for meaningful review. Of course it's difficult, but if you're the agency in this situation, you've got to be going, you've got to be bending over backwards to provide due process, right? And you've got to provide that opportunity, and you've got to have your ducks in a row, you've got to be ready to present this evidence of this imminent emergency threat to a neutral ALJ, and if the enjoined party needs more time and asks for it, then they're waiving that right for a faster review. But you've got to be ready, and that's not what happened here. Here there wasn't even a place to hold the hearing, if I understood this correctly, where you could stay past five o'clock, right? I believe that's correct, although I'm not sure. Yeah, that's awful. Well, Your Honor, respectfully, most imminent hazard orders do not result in an ALJ proceedings. Most imminent hazard orders, as was discussed during my colleague's argument, result in a discussion between the agency and the motor carrier so that they can get back on the road as quickly as possible. That didn't happen as the motor carrier petitioned. As soon as the agency received the motor carrier's petition for review, that was on April 7th. The hearing began three days later on April 10th, and it was concluded five days later on April 15th. And the reason that it took longer than expected, the reason that it took longer than the parties had initially believed that it would, is because of, frankly, extensive cross-examination of the agency's witnesses by the motor carrier. As well as a five o'clock limit, and I think people took the weekend off, too, right? That's correct, Your Honor. I mean, the business doesn't... When in the course of the proceedings was the issue as to the need for a pre-deprivation hearing first presented by DND? As to the need for a pre-deprivation hearing? Yes. I believe during the hearing before the ALJ, DND did make a claim about its procedural due process rights. I'm not sure... It was too late then. Pardon me, Your Honor? It was too late then. You say before the ALJ, this process has already started. And I guess, at least all I'm asking is, wouldn't there be a more gradual approach so they can, if nothing else, say, you know, this imminent... I keep using the acronym. Imminent hazard order. I don't get that right either. But say this is a strong possibility, if nothing else, they can cease operations, stop the deliveries, and not have everybody out on the road somewhere running up all sorts of problems. I'd say that would be minimal. Just kind of a warning, say this is very possible and we may have to have a hearing to at least preempt it and maybe have this hearing. But this is what troubles me, is the draconian results of this. And I'll ask you the same I ask him. How often does this happen? About 15 to 20 times a year, Your Honor. Is it, and I gave a couple of kind of extreme hypotheticals about hauling drugs and a lot of people are not eligible to drive. Something is pervasive within the company. That's pretty obvious, that one needs to be shut down. How many like this, where the ALJ goes through the hearing and finds out that it wasn't necessary? I don't have exact numbers, Your Honor. I know, with respect to an ALJ finding that it's not necessary, it happens extraordinarily rarely. The last time we were able to find it happening before this time was a case from 1999. So this is the second time this has happened? That's right. So the allegation or the suggestion that this is a power that is wielded inappropriately by the agency, that it is done sort of half-cocked. So this isn't common. Pardon me? What we've got before us is not common. No, it is not common. And even though it pretty much ruined or really injured this company, it's very rare. So doing all what we're talking about, the preliminary and stuff, isn't necessary based on the history of what's going on under this law, I guess. That's correct, Your Honor. And just to emphasize the point, the Supreme Court has made clear that procedural due process requires a balance. It requires a balance of the private party's interests, the public's interest, and the risk of error. And this is a case where the agency concluded that there was an error. But that is extremely rare, and I do want to point out that the consequences of failing to act, the agency failing to act when it should have acted, are extremely severe as well. And that cost is measured not in money, but in human lives. Has that ever happened? Pardon me? Has that ever happened where the agency should have shut them down and they didn't, and caused all kinds of problems? I think that's what you just said. There have been suggestions that that is the case, Your Honor. Certainly there have been accusations that the agency should have acted and did not. I see that time is up. I'd be happy to answer any further questions the Court may have. Thank you very much. Mr. LaPorte, come on up. Thank you, Your Honor. I wasn't sure if I had any rebuttal time or not. Well, I'm giving you some. Thank you. I'm giving you two minutes. Okay. Thank you, Your Honor. And if you take three, it'll be fine too. I would just like to address how this works in practice. In counsel's statement that we have very few ALJ decisions, or very few of these imminent hazard orders proceed to an ALJ decision. And the reason that is, is because, number one, the carrier is extremely motivated to resolve its issues with the FMCSA. And it approaches the FMCSA and, you know, what do we need to do to satisfy you to get up and running? And an agreement is entered. My point with due process is I don't know why that conversation cannot take place before the imminent hazard order is issued. And the other reason very few of these cases make it to an ALJ is the company just folds up. And goes away. Now, if the assistant administrator's ruling is allowed to stand, the way this is going to work in the future is I'm going to have a client come to me with an imminent hazard order. And I'm going to take a look at it and take a look at the evidence. And I may be advising that client that there's a very good opportunity to get this rescinded. That we will be successful before the ALJ. And the first question that client is going to ask me is, well, how long is it going to take me to get back on the road? And under the assistant administrator's current decision, my answer is, I don't know. It could be 10 days. It could be 10 weeks. It could be 10 months. In interpreting the imminent hazard statute and their authority in a manner in which I cannot answer that question is unconstitutional. D&D is the aggrieved party here. D&D was aggrieved both by the arbitrary and capricious conduct of the FMCSA. And they were aggrieved by the procedures that were used, by the misinterpretation of the statute, and the lack of pre-deprivation notice and an opportunity to be heard. It is correct, isn't it, that a driver who was driving excessive hours caused a fatal accident and that a number of other drivers were also over their hours when the agency looked into it? Your Honor, it is true that D&D's driver was over hours at the time of the accident, but there is no evidence. In fact, the evidence is to the contrary, that D&D dispatched that driver in a manner which would cause him to be over hours of service. And the record reflects... Now, he's your employee. You guys are responsible for managing him. Your Honor, there is no dispute about that, and D&D never shirked its obligations in that regard. The reason I want to just point those things out is, I mean, the focus here is attacking the agency, but the agency was responding to a tragic accident caused by your driver, who was in violation of laws intended to prevent such accidents, right? There is no doubt about that, Your Honor. Thank you. All right. Thank you very, very much to both parties, and the case will be taken under advisement.